Susan G. **FURMAN**, as Executrix of the Estate of Robert Jay Furman, Deceased, Plaintiff,

v.

**GENERAL DYNAMICS CORP.** and McDonnell Douglas Corp., Defendants.

Susan G. **FURMAN**, as Executrix of the Estate of Robert Jay Furman, Deceased, Plaintiff,

v.

**OEA, INC.,** Defendant.

**Nos. 73 Civ. 642 and 73 Civ. 1320.**

United States District Court, S. D. New York.

Jan. 29, 1974.

Kreindler & Kreindler, New York City, for plaintiff by Melvin I. Friedman, David Goldstein, James J. Sullivan, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant Gen. Dynamics Corp. by William J. Junkerman, Carroll E. Dubuc, Randal R. Craft, Jr., New York City, of counsel.

Crowe, McCoy & Agoglia, Mineola, N. Y., for defendant McDonnell Douglas Corp. by Harold V. McCoy, Mineola, N. Y., of counsel.

Rogers & Wells, New York City, for defendant OEA, Inc. by William R. Glendon, Thomas W. Towell, Jr., New York City, of counsel.

KEVIN THOMAS DUFFY, District Judge.

These are the last of a series of motions in two related actions for the wrongful death of a thirty-two year old Air Force major; the earlier motions were decided in a memorandum filed July 17, 1973. The actions arose on April 23, 1971, when a military F III E aircraft crashed on a test flight at the Leach Lake Gunnery Range in California, killing co-pilots Robert Jay Furman and James W. Hurt. At the time of the crash, the parachute ejection system apparently malfunctioned, and as a result the canopy of the capsule failed to separate as it was designed to do.

Plaintiff brought a suit in this district against both the manufacturer of the aircraft, General Dynamics Corp., and the manufacturer of the parachute ejection system, McDonnell Douglas Corp., and later filed a separate suit against the manufacturer of the explosive device in the cockpit ejection system, OEA, Inc. Major Hurt's legal representative filed a similar action in the Central District of California.

The two Furman cases were consolidated on July 17, 1973 and ordered transferred to the Central District of California for the sake of convenience pursuant to 28 U.S.C. § 1404(a). The transfer was stayed, however, pending the determination of the two motions which are the subject of this opinion.[1]

The first is a motion by OEA to dismiss the complaint for lack of personal jurisdiction. OEA is a Delaware corporation with its principal place of business in Illinois. It is not licensed to do business in New York and claims to do no business here. It was served pursuant to Section 307 of the New York Business Corporation Law, McKinney's Consol.Laws c. 4, and in order for such service to be valid, the corporation must be subject to the jurisdiction of New York State under either Section 301 or Section 302 of the CPLR, McKinney's Consol.Laws, c. 8. Since the cause of action did not arise from any contact OEA might have had with New York, Section 302 is not applicable. Thus the question becomes whether OEA is "doing business" in New York to the extent necessary to subject itself to jurisdiction under Section 301.

In order to resolve this question, the parties have conducted considerable discovery regarding OEA's activities in New York. In addition to manufacturing explosive devices for escape systems in military aircraft, OEA manufactures exit systems for commercial 747 aircraft, as well as other explosive and propellant devices for missiles and weapons

---

1. At that time these matters were assigned to another judge in this District and through inadvertence were not reassigned to me as a related case for a period of time.

systems. During the last four years OEA has shipped approximately $900,000 worth of these products to or through New York. Most of these shipments (amounting to approximately $620,000) were bomb ejectors sold to Boeing Aircraft Corp. of Seattle, Washington, and shipped at its direction, F.O.B. Illinois, to Plattsburgh Air Force Base in Plattsburgh, New York. The remaining shipments were either replacement parts for F-4 jet aircraft, or parts, mainly thrusters, used in connection with the escape chutes of Boeing 747 aircraft. The F-4 parts were sent through New York to various foreign countries and foreign air forces, the orders having usually been placed by a New York procurement office of the foreign government directing that the goods be shipped to overseas freight forwarders located in New York. The parts for the 747s were ordered by various airlines, including many foreign airlines, with directions for delivery to New York, often to the airlines terminal at Kennedy Airport, sometimes for reshipment overseas. All such shipments, whether for F-4 or 747 aircraft, were made F.O.B. Illinois.

In January 1973, OEA appointed Cornhill Commercial Co., Inc. of New York City as its sole representative for overseas sales. Although located in New York, Cornhill does not make any sales in New York but is limited to sales abroad. All orders obtained by Cornhill are sent to and accepted by OEA in Illinois.

In addition, OEA owns three subsidiaries, Mathewson Tool Co., Matco Equipment Co., both located in Orange, Connecticut, and Explosive Technology, Inc. (ET) located in Fairfield, California, of which at least one, ET, does a certain amount of business in New York. ET, like OEA, manufactures explosive parts for government contractors in the aircraft and aerospace industry. ET has sold and continues to sell such parts to Grumman Aircraft Corp., located in Bethpage, New York, pursuant to a contract to supply certain components for

an F-14 project. The approximate value of such sales to Grumman is in excess of one million dollars. In addition, ET has regularly submitted and continues to submit proposals for potential sales to Fairchild Industries and General Electric Co., both located in New York. Between November 11, 1970 and March 3, 1973, these New York customers of ET occasioned more than eighty visits to New York by ET officers and employees.

ET also manufactures an item of firefighting equipment known as Jet Axe. ET presently has exclusive franchising agreements with two New York companies for the distribution of Jet Axe. In 1972, Jet Axe sales in New York amounted to $3,500.

Although OEA has no New York office, its officers occasionally travel to New York on business. From early 1970 through October 1973, there were nine such trips, some for the purposes of meeting with officers of Grumman Aircraft to discuss joint bidding on federal contracts, to debrief Grumman's officers on various proposals and to discuss proposals previously submitted to Grumman. The other trips were aimed at increasing business for Mathewson Tool Co. and ET. Despite these trips, Grumman was never a customer of OEA.

Plaintiff maintains that all these contacts with New York collectively constitute "doing business" with sufficient regularity and continuity to make OEA subject to New York's jurisdiction under CPLR § 301. Section 301 states simply that:

"A court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore."

The statute thus provides no guidance other than a direct referral to the New York decisions defining the circumstances under which a foreign corporation may fairly be expected to defend a law suit in New York not arising from its activities in this state. These decisions must therefore form the necessary

framework for any analysis of the plaintiff's case.

■ The traditional rule in New York has been that in order to come within Section 301 a foreign corporation must have been doing business here "with a fair measure of permanence and continuity." Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 267, 115 N.E. 915, 917 (1917). This has often meant having an office in New York for the purpose of soliciting business and taking orders, as in the Tauza case where a Pennsylvania coal company maintained a New York office with eight salesmen and clerical staff and was consequently held to be doing business in New York. Similarly, in Bryant v. Finnish National Airline, 15 N.Y.2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 439 (1965), the defendant's New York office, although small, was considered sufficient basis to find that it was doing business in New York.[2] Thus, if OEA had an office in New York for the solicitation of business a court would almost certainly find that it was doing business here; but since OEA has no such office, it becomes necessary to turn to cases where other business contacts formed the basis for jurisdiction.

■ Where a foreign defendant has no office or employees in New York but is nonetheless selling products or services in New York, the New York courts may exercise jurisdiction if 1) the foreign corporation is operating through a subsidiary or a parent in such a way as to justify piercing the corporate veil or 2) doing business in New York through an agent. Plaintiff maintains that in addition to its direct contacts, OEA is doing business in New York both through its wholly owned subsidiary, ET, and through its sales agent, Cornhill Commercial Co. However, an examination of the law leaves considerable doubt that the New York courts would find in the activities of these corporations a sufficient basis for exercising jurisdiction over OEA.

■ Generally, a corporation is not subject to jurisdiction in New York because of the activities of its subsidiary. Simonson v. International Bank, 16 A.D.2d 55, 225 N.Y.S.2d 392 (1st Dept. 1962), aff'd, 14 N.Y.2d 281, 251 N.Y.S.2d 433, 260 N.E.2d 427 (1964). An exception has developed, however, where the subsidary does not operate as an entirely separate corporation, but rather more as a department of the parent. In Taca International Airlines, S. A. v. Rolls Royce of England, Ltd., 15 N.Y.2d 97, 256 N.Y.S.2d 129, 204 N.E.2d 329 (1965), for example, an American subsidiary was found to be functioning as an incorporated department of its British parent, and the parent was therefore held subject to New York jurisdiction. The British parent owned all the stock of its Canadian subsidiary which, in turn, owned all the stock of the New York subsidiary. All three corporations had certain directors in common, and key executives of the New York company were former executives of the Canadian or British companies. The British company assigned these executives to their positions in the New York corporation and also gave technical training to other employees of the New York company. The New York company sold only Rolls Royce products manufactured in England and all of its income went to the Canadian company and was reported in that company's balance sheet. These facts led the New York courts to conclude that the New York corporation amounted to nothing more than an incorporated department through which the British corporation was doing business in New York.

2. A closer question is presented by the case of Scanapico v. Richmond, Fredericksburg & Potomac R. Co., 439 F.2d 17 (2d Cir. 1970), on which plaintiff relies, where the defendant did not maintain a New York office. However, even there, as contrasted with the case at bar, two of the defendant's employees, one of whom was a New York resident, regularly solicited freight business for the defendant in New York. The presence of an employee in New York was also a distinguishing factor in Benjamin v. Logan, 34 Misc.2d 46, 227 N.Y.S.2d 1009 (Sup.Ct. 1962), also relied on by the plaintiff.

■ The relation between ET and OEA, however, contrasts sharply with the relations between the corporations in the *Taca* case. Although OEA may have been heavily represented on the ET Board of Directors, the two companies maintain separate books and separate product lines. Neither company sells the other's products. Unlike the New York subsidiary of Rolls Royce, which was apparently created by the parent for the purpose of doing business in New York and other states, ET was an established company when it was acquired by OEA in 1971, and its business has not changed since the acquisition. In short, although it is owned by OEA, it continues to do its own business, not that of OEA, and thus functions as a separate corporation, not a mere department of OEA. I find therefore that OEA is not doing business in New York through its subsidiary.[3]

■ Plaintiff also maintains that OEA is doing business here through its agent, Cornhill Commercial Co. The leading New York case on this question is Frummer v. Hilton Hotels International, Inc., 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967). There the court held that a British corporation owning the London hotel where the plaintiff was injured did business in New York through a hotel reservation service, the Hilton Credit Corporation, which was operated on a non-profit basis for the benefit of the London and other Hilton hotels. Both the British corporation, Hilton Hotels (U.K.) Ltd., and the Hilton Credit Corporation were owned by two Delaware corporations, Hilton Hotels Corporation and Hilton Hotels International. The Hilton Credit Corporation had a New York office, employees and bank account and thus was clearly doing business in New York. On behalf of Hilton Hotels (U.K.) Ltd. it solicited business, provided liaison with travel agents, and made reservations for the London Hilton or any other Hilton hotel. Such reservations were confirmed when made and were not merely relayed to the hotels for confirmation. Based on these facts the New York Court of Appeals concluded that the British corporation was doing business here through its agent, the Hilton Credit Corporation, because "the Service does all the business which Hilton (U.K.) could do were it here by its own officials." 19 N.Y.2d at 537, 281 N.Y.S.2d at 44, 227 N.E.2d at 854.

Again there is a marked contrast between the *Frummer* case and the case at bar. Since Cornhill Commercial Co. is an entirely independent entity from OEA, the element of common ownership of the principal and agent corporation in *Frummer* is strikingly absent here. This element is admittedly not decisive, but the Court of Appeals found it significant because "it gives rise to a valid inference as to the broad scope of the agency." 19 N.Y.2d at 538, 281 N.Y.S.2d at 45, 227 N.E.2d at 854. Thus, in the absence of common ownership, other indications of a broad agency agreement must be found. Yet despite extensive discovery the parties have failed to provide any such indications. The scope of the agency covers only foreign sales[4] which account for no more than a small fraction of the goods OEA ships to or through New York, and any orders solicited by Cornhill from abroad must be forwarded to and accepted by OEA in Illinois. Thus Cornhill is clearly not doing all the business in New York which OEA could do were it here by its own officials.

Plaintiff's argument is rendered even more tenuous by the most recent deci-

3. In this respect W. Lowenthal Co. v. Colonial Woolen Mills, Inc., 38 A.D.2d 775, 327 N.Y.S.2d 899 (3d Dept. 1972), on which plaintiff relies, is also distinguishable. There a foreign subsidiary was found to be doing business in New York through its New York parent to whom or through whom it sold 85 to 90 per cent of its production. In addition, the New York corporation displayed the name of the foreign corporation on its door and listed its telephone number as that of the foreign corporation.

4. Furthermore, these foreign sales do not include sales to foreign airlines of replacement thrusters for Boeing 747s.

sion of the New York Court of Appeals in Delagi v. Volkswagenwerk AG of Wolfsburg, Germany, 29 N.Y.2d 426, 328 N.Y.S.2d 653, 278 N.E.2d 895 (1972). There the defendant exported automobiles to the United States through a wholly owned subsidiary, a New Jersey corporation. Neither the parent nor the subsidiary was qualified to do business in New York nor had any office here. The plaintiff argued that they were nonetheless doing business in New York through their New York distributor, World-Wide Volkswagen Corp., a publicly owned corporation which took title to the cars at ports outside New York and shipped them to local independent franchised dealers in New York. The Court of Appeals held that because of the independent ownership and functioning of World-Wide, it could not be considered an agent through which Volkswagen AG was doing business in New York.

In reaching this result, the Court emphasized that the element of common ownership, on which it had based the inference of agency in *Frummer*, was entirely lacking, and that without it, "a valid inference of agency cannot be sustained." 29 N.Y.2d at 431, 328 N.Y.S.2d at 656, 278 N.E.2d at 897. In addition, the Court stated that even if World-Wide had been a subsidiary of Volkswagen AG, the amount of control exercised by Volkswagen AG over World-Wide's operations was not sufficient to subject Volkswagen AG to jurisdiction in New York. Yet the control of Volkswagen AG over World-Wide was not insubstantial, including as it did:

"(1) sale by each dealer of a minimum number of automobiles upon penalty of forfeiture of their dealer franchises; (2) uniform design for dealer service departments; (3) service personnel to be trained in Germany; (4) uniform purchase and sales prices, and (5) prior approval of prospective dealers." 29 N.Y.2d at

432, 328 N.Y.S.2d at 656–657, 278 N.E.2d at 897.

Here the plaintiff has not produced any evidence of equal control by OEA over the operations of Cornhill Commercial Co., much less the greater control which would be required to support a finding of agency according to the standards established in *Delagi*.

The lack of ownership and control by OEA of Cornhill Commercial Co. also distinguishes the case at bar from Sunrise Toyota Ltd. v. Toyota Motors Co., 55 F.R.D. 519 (S.D.N.Y.1972), the most recent case relied on by the plaintiff. There two publicly owned Japanese corporations which made and sold Toyota cars were joint owners of a California corporation which imported the cars and which in turn owned another California corporation, the distributor of the cars. Applying the standards established in *Delagi*, the Court found first that the California corporations were doing business in New York because of their extensive activities in the state although they had no office here, and then that the Japanese corporations sufficiently controlled the operations of their California subsidiaries to bring them within the jurisdiction of New York as well. In a case such as the one at bar, where the elements of ownership and control are lacking, a similar analysis must lead to the opposite result.[5] For all of the above reasons the defendants' motion to dismiss for lack of jurisdiction is granted.

■■ The plaintiff has also moved to strike the defense of the statute of limitations raised by defendants General Dynamics Corp. and McDonnell Douglas Corp. At the outset it is necessary to dispose of the defendants' procedural objections to the decision of this motion. Defendants correctly maintain that a motion to strike a defense is the equivalent of a motion for partial summary judgment and that the party opposing

---

5. The other cases cited by the plaintiff in support of the agency theory all involved foreign jurisdictions with different standards than New York and are therefore not applicable.

such a motion is entitled to ten days' notice as provided by Fed.R.Civ.P. 56(c). This motion was served on Friday, October 26, 1973, and made returnable November 2, 1973, only seven days later. However, during the week of October 29, the Court informed counsel that the motion would be adjourned to November 9, 1973, and argument was actually heard on that day. Thus, in fact, if not in form, the ten day period was observed, and the Court may therefore address the merits of plaintiff's motion.

The action against General Dynamics Corp. and McDonnell Douglas Corp. was commenced between one and two years after the cause of action arose.[6] Thus the decision of the motion to strike the defense of the statute of limitations hinges on whether the applicable statute is that of California (one year) or that of New York (two years).[7] This question in turn requires construction of New York's "borrowing statute", CPLR § 202, which states:

> "An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply."

The parties agree that the cause of action for wrongful death accrued in California when the plane crashed, but thereafter their views of the case sharply diverge.

■ Their first point of difference is whether the cause of action accrued in favor of Major Furman or his wife. The plaintiff argues that although the wrongful death statute N.Y.E.P.T.L. 5–4.1, McKinney's Consol.Laws, c. 17–b provides that the only person authorized to bring a wrongful death action is the decedent's personal representative, nonetheless the Court of Appeals of this Circuit has held in Nolan v. Transocean Airlines, 276 F.2d 280 (2d Cir. 1960), set aside on other grounds, 365 U.S. 293, 81 S.Ct. 555, 5 L.Ed.2d 571 (1961), that in applying the borrowing statute to wrongful death action the decedent's residence, not his personal representative's, is controlling. In Nolan, none of the parties had any contact with New York, except for the administrator appointed by the South Carolina court, who would not have benefited from the wrongful death action. Under these circumstances the refusal of the Court of Appeals to apply the New York statute of limitations cannot be interpreted as a conclusion that the decedent's residence is controlling. A more reasonable interpretation, and one more in accord with the language of Section 5–4.1, is that the Court should look to the residence of the beneficiaries of the estate on whose behalf the action is brought. Where, as here, the executrix and the beneficiary are the same person, the dichotomy which the court faced in Nolan does not arise. In short, the relevant residence here is Mrs. Furman's.

However, the parties also differ with regard to where Mrs. Furman resided when the cause of action arose. The plaintiff insists that her legal residence was clearly New York, but the defendant argues that there are factual issues which must be determined before such a conclusion can be drawn. It is true that most of the questions posed in the interrogatories and depositions were directed at discovering Major Furman's residence, not his wife's. Nevertheless, the answers she gave, coupled with her affidavit, demonstrate that she as well as he, was a resident of New York. Mrs. Furman and her husband lived in New York until he entered military service and continued to view New York as their domicile during his various tours of duty. According to Mrs. Furman, they returned to New York for family

---

6. The accident occurred on April 23, 1971, and the complaint was filed on January 11, 1973.

7. See Cal.Code Civ.P. § 340(3) (West 1954); N.Y.E.P.T.L. § 5–4.1 (McKinney 1967).

visits whenever they could, which was at least once a year unless they were overseas. Both Mrs. Furman's parents and her husband's parents lived in New York continuously for the ten year period preceding his death, and after his death Mrs. Furman and the children returned to New York to live with her husband's parents for a few months before they moved to Florida.

The general rule in New York and elsewhere is that military service in no way affects a person's domicile or permanent residence, in the absence of acts showing an intent to change it. Application of Brown, 4 A.D.2d 157, 163 N.Y.S.2d 780 (4th Dept. 1957); Tickel v. Oddo, 66 Misc.2d 386, 320 N.Y.S.2d 268 (Sup.Ct.1971); Kinsel v. Pickens, 25 F.Supp. 455 (W.D.Tex.1938); Wise v. Bolster, 31 F.Supp. 856 (W.D.Wash. 1939); Seegers v. Strzempek, 149 F. Supp. 35 (E.D.Mich.1957). A consistent application of this rule requires that it include military wives who accompany their husbands on tours of duty. Furthermore, in construing the borrowing statute CPLR § 202, the New York courts have interpreted "resident" to mean someone who considers New York his domicile, whether or not he is physically located here when the cause of action accrues. Jones v. Greyhound Bus Lines, 73 Misc.2d 109, 341 N.Y.S.2d 159 (Sup.Ct.1973); see also Banasik v. Reed Prentice Div. of Package Mach. Co., 34 A.D.2d 746, 310 N.Y.S.2d 127 (1st Dept. 1970), aff'd, 28 N.Y.2d 770, 321 N.Y.S. 2d 376, 269 N.E.2d 618 (1971). Thus if Mrs. Furman remained a New York domiciliary from the time she lived in New York until the time of her husband's death, the New York statute of limitations must apply.

Defendants argue that there is a genuine question of fact regarding Mrs. Furman's domicile, but their argument fails to take account of the importance of intent in effecting a change in domicile. It is true that Mrs. Furman actually resided outside New York for a number of years while her husband served in the Air Force, and that the Furmans bought a house in Ohio and lived there from September 1968 to December 1969, while Major Furman was earning a Master's degree at Ohio State University. However, Mrs. Furman has testified that they bought the house only because they could not find a house to rent. They were in Ohio for the purpose of her husband's further education and did not consider it their permanent home. Having reviewed all of the affidavits, interrogatories and depositions submitted by the parties, I have concluded that no genuine dispute of fact exists; and that the New York statute of limitations must apply; and that the motion to strike the defense of the statute of limitations must be granted.

In my prior opinion I indicated that the case would be transferred to the Central District of California 14 days after the decision of these motions. The delay I then suggested now seems inappropriate since the parties have known of the impending transfer for some time and the related case is now actually ready for trial. The case will be transferred immediately.

So ordered.