**In re ALSTED AUTOMOTIVE WAREHOUSE, INC., Debtor.**

**ALSTED AUTOMOTIVE WAREHOUSE, INC., Debtor/Plaintiff,**

v.

**FORD MOTOR CO., Defendant.**

**ALSTED AUTOMOTIVE WAREHOUSE, INC., Debtor/Plaintiff,**

v.

**PUROLATOR, INC., Defendant.**

**Bankruptcy No. 880–02496–20.**

**Adv. Nos. 880–0392–20, 880–0387–20.**

United States Bankruptcy Court,
E. D. New York,
at Westbury.

Jan. 29, 1982.

Hahn & Hessen, New York City, for debtor/plaintiff; Kevin Kelly, New York City, of counsel.

Rood, Schwartz & Cohen by Melvin C. Cohen, New York City, for defendant Ford Motor Co. and Purolator, Inc.

ROBERT JOHN HALL, Bankruptcy Judge.

James Barr, the Trustee for Alsted Automotive Warehouse, Inc. ("Alsted"), a debtor under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 701 *et seq.* (Supp. IV 1980), commenced the instant adversary proceedings against Ford Motor Company ("Ford") and Purolator, Inc. ("Purolator") (collectively "the defendants") seeking to invalidate the security interests which the defendants have claimed in Alsted's inventory based on the defendants' alleged failure to properly perfect these interests under section 9–401 of the New York Uniform Commercial Code,[1] N.Y.U.C.C. § 9–401 (McKinney 1964 & Supp. 1980–1981). For the reasons here-

---

1. The complaints also asked that the Trustee might sell the inventory free and clear of any liens. Subsequently, the parties stipulated that the Trustee might so sell the inventory provided that the proceeds be held in escrow pending the outcome of these adversary proceedings.

inafter stated, the Court finds for the Trustee.

## I.

Alsted was formed in 1971 by Theodore Freedman, Stanley Padover and Allen Menaker, its business being the wholesale distribution of automotive parts. Alsted's sole warehouse and office was located, at all times relevant to these proceedings, at 110 Schmitt Boulevard, Farmingdale, New York, which lies in Suffolk County.

In 1972, these same three individuals formed Alsted Automotive Warehouse of Brooklyn, Inc. ("Brooklyn, Inc.") which later became a wholly-owned subsidiary of Alsted Industries, Inc., a holding company in which Freedman, Padover and Menaker held an interest. As in the case of Alsted, the business of Brooklyn, Inc. was the wholesale distribution of automotive parts. In Brooklyn, Inc.'s case, however, its warehouse was located at 5924–13th Avenue, Brooklyn, New York. Moreover, in 1978, Brooklyn, Inc. ceased operations and went out of business.

In addition to Alsted and Brooklyn, Inc., Freedman, Padover and Menaker held substantial, if not controlling, interests in a string of automotive parts retail outlets.[2] The most significant of these, in terms of these proceedings, was Allstate Automotive Discount Center, d/b/a Arthur's Auto Parts ("Arthur's") which was located in Hempstead, New York in Nassau County.[3]

In 1975, Alsted entered into an open account agreement with Ford for the purchase of their automotive parts and in connection therewith executed a security agreement in Ford's favor collateralized by the purchase or to be purchased parts. Apparently believing that Alsted was located in Nassau County,[4] Ford attempted to perfect this security interest by filing a UCC financing statement with the Secretary of State in Albany and the County Clerk's office in Nassau County.[5]

Alsted entered into a similar arrangement with Purolator which attempted to perfect in the identical manner.[6]

## II.

The Trustee's position is that Alsted had a place of business in one and only one county of New York, to wit: Suffolk. Therefore, to properly perfect their security interests, Ford and Purolator had to file both centrally in Albany and locally in Suffolk County. See N.Y.U.C.C. § 9–401(1)(c) (McKinney 1964 & Supp. 1980–1981). In that they did not, their security interests are unperfected, and consequently, subordinate to existing lien creditors. See id. at § 9–301. Finally, as a hypothetical lien creditor under 11 U.S.C. § 544, the Trustee argues that his position is superior to that of Ford and Purolator.

Ford and Purolator responded by arguing that Alsted had places of business in more than one county of New York, and therefore, central filing was sufficient to perfect their security interests thereby giving them priority over the Trustee.

Purolator asks the Court to "pierce the corporate veil" between Alsted, Arthur's and the other retail outlets in which Freedman, Padover, and Menaker held interests and thereby find that Alsted had a place of business at each of these locations. Ford, in

---

2. These included Allstate Automotive Discount Center of Franklin Square, Inc., Allstate Automotive Discount Center of Amityville, Inc., Allstate Automotive Discount Center of Stony Brook, Inc., and Allstate Automotive Warehouse of Oakdale, Inc.

3. Neither defendant offered any evidence as to the location of the other outlets except for the Franklin Square store which is in Nassau County. Moreover, other than indicating this location, no further evidence was introduced concerning this Franklin Square store.

4. Most of Farmingdale is located in Nassau County. See P.S. Products Corp. v. Equilease Corporation, 435 F.2d 781, 782 (2d Cir. 1970).

5. The Court was not informed of the date of the filing.

6. Furthermore, although neither side indicated the date of the agreement or of the filing, presumably it could not have been prior to 1979, which was when Alsted first became Purolator's customer.

addition to this argument, claims that Alsted held itself out to the public as doing business from Brooklyn, Inc.'s location, and accordingly, had a place of business in Brooklyn within the meaning of section 9–401(1)(c).

### III.

Section 544 of the Bankruptcy Code cloaks the trustee, as of the commencement of the case, with the rights and powers of a "hypothetical" judicial lien creditor. 11 U.S.C. § 544. *See also id.* at § 101(27). Accordingly, the trustee may avoid any security interest that would be avoidable under nonbankruptcy law by a creditor on a simple contract who, at the commencement of the case, extends credit and obtains a judicial lien on the debtor's property, whether or not such creditor exists. *Id.* at § 544(a)(1);[7] B. Weintraub & A. Resnick, *Bankruptcy Law Manual* ¶ 7.01 (1980). *See generally Collier on Bankruptcy* ¶ 544.02 (15th ed. 1981). Moreover, such is true without regard to any knowledge of the trustee or of any creditor. 11 U.S.C. § 544(a).

Moreover, section 9–301 of the U.C.C. provides in pertinent part:

> [A]n unperfected security interest is subordinate to the rights of . . . (b) a person who becomes a lien creditor before the security interest is perfected;

N.Y.U.C.C. § 9–301(1) (McKinney Supp. 1980–1981).[8] *See also id.* at § 9–301(3).

Finally, section 9–401, which provides the locations for filing a financing statement in order to perfect a security interest under section 9–301, provides in pertinent part:

(c) in all other cases, in the department of state and in addition, if the debtor has a place of business in this state and in only one county of this state, also in the office of the filing officer of such county;

N.Y.U.C.C. § 9–401(1)(c) (McKinney 1964 & Supp. 1980–1981). *See also id.* at § 9–302(1) (McKinney 1964 & Supp. 1980–1981).

Accordingly, the sole issue before the Court is whether Alsted had a "place of business" in only one or more than one county of New York.

### IV.

The Uniform Commercial Code nowhere defines "place of business." J. White and R. Summers, *Uniform Commercial Code* § 23–14 (1972). To fill this void, White and Summers hypothesized the use of a "quantity" test, *i.e.*, how much work was accomplished at that location; or a "notoriety" test, *i.e.*, "to what extent do creditors and others know that the debtor *in fact was doing business* at the place in question." *Id.* at 826 (emphasis added). Furthermore, while White and Summers advocated the notoriety test, *id.* at 827, it should be noted that, even as formulated by them, the test presupposes that a minimum quantum of business had been transacted by the debtor at the location in question.

The test in New York, as stated by the Second Circuit, is essentially a hybrid of these two tests. *See In re Mimshell Fabrics, LTD.*, 491 F.2d 21, 23 (2d Cir. 1974); *cf. In re Enark Industries, Inc.*, 86 Misc.2d 985, 383 N.Y.S.2d 796 (App.Term 1976) (per curiam). As explained by *Mimshell*, the test is composed of two parts: 1) was the debtor actually doing business at the location in

---

**7.** (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple

contract could have obtained a judicial lien, whether or not such a creditor exists;

11 U.S.C. § 544(a)(1).

**8.** Due to the Bankruptcy Code language rendering the trustee's or a creditor's knowledge no defense, *see* 11 U.S.C. § 544(a), it would appear to make no difference whether the pre or post 1977 version of section 9–301(a) applies. Moreover, should that not be the case, section 9–301(3), N.Y.U.C.C. § 9–301(3) (McKinney 1964), would necessitate the identical result in the instant case.

question as evidenced by its frequent use by the debtor in the production of revenue? 491 F.2d at 23; *In re Airequipt, Inc.*, 1 B.C.D. 1494 (S.D.N.Y.1975); *see P.S. Products Corp. v. Equilease Corporation*, 435 F.2d 781, 783 & n.3 (2d Cir. 1970); *see, e.g., In re John Adams Henry, Inc.*, 5 U.C.C. 795, 799–801 (B.C.S.D.N.Y.1968); *In re Golden Kernel, Inc.*, 5 U.C.C. 43 (B.C.E.D.Pa.1968); *cf. In re McQuaide*, 5 U.C.C. 802, 807 (B.C. D.Vt.1968) (bookkeeping isn't doing business); *In re Falkof*, 2 U.C.C. 731 (B.C.D. Mass.1963) (holding preparatory meetings isn't doing business); and 2) was such use notorious, *i.e.*, was there a "class of probable potential creditors [who knew] of the second place of business? 491 F.2d at 23. *See also In re Mauck*, 378 F.Supp. 904 (W.D. Va.1974); *In re Bethlehem Concrete Corp.*, 306 F.Supp. 1047 (E.D.Pa.1969).

The case law is clear, however, that the mere appearance of doing business at a location, no matter how notorious, is insufficient to constitute such location a place of business within the meaning of the statute.

For example, in *P.S. Products, supra*, the Second Circuit held that where no actual business was done in Nassau County, the listing of a Nassau County address in the Certificate of Incorporation did not make that location a place of business under section 9–401(1)(c). Nor did the renting of a Nassau County Post Office Box. 435 F.2d at 783.

An even more extreme set of facts was presented in *Uniroyal, Inc. v. Universal Tire & Auto Supply Co.*, 557 F.2d 22 (1st Cir. 1977). In *Uniroyal*, the debtor's actual location was in Brookline, Massachusetts on the border of Boston. The debtor, however, listed this on his letter head as being within Boston. The First Circuit, after noting the almost impossible task a creditor would have had in discovering the correct municipality that the debtor was actually located in, nevertheless held the debtor's sole place of business to be in Brookline. *Id.* at 23.[9] For a similar result, *see In re B & B Concrete, Inc.*, 10 U.C.C. 1282 (D.Vt.1971).

These cases must be contrasted with *Mimshell*. In *Mimshell*, the bankrupt was located in Suffolk County while an affiliated corporation, M.B.S., was doing business in Manhattan. The crucial circumstance, however, which distinguishes *Mimshell* from cases like *P.S. Products* and *Uniroyal* is that M.B.S. was found to have allowed the bankrupt's employees frequent use of its Manhattan show room so that the bankrupt might generate sales. *See* 491 F.2d at 22; *cf. In re John Adams Henry, Inc.*, 5 U.C.C. 795, 799–801 (B.C.S.D.N.Y.1968) (each telephone salesman working full time out of his home constituted a place of business).

■ Applying the foregoing to the case at bar, the Court notes that the defendants established that Alsted, Brooklyn, Inc. and Arthur's were affiliated enterprises controlled by the same persons, each enterprise doing business in a different county of New York; that Alsted produced and circulated a series of advertisements and business forms which listed its operations as having been conducted at both 110 Schmitt Boulevard in Farmingdale and 5924–13th Avenue in Brooklyn; that Ford had "drop-shipped" orders from Alsted to Brooklyn, Inc. (*i.e.*, Alsted had ordered parts from Ford which were delivered directly by Ford to Brooklyn, Inc.); and that Alsted had guaranteed Brooklyn, Inc.'s account with Monroe Auto Equipment Corp.

In response, the Trustee established that, while in existence, Alsted, Brooklyn, Inc., and Arthur's were all profit motivated enterprises which maintained their own inventories, their own clientele [10] and their own books and records; they were billed individually by their suppliers (who were obviously aware of this separateness) and they billed

---

**9.** The *Uniroyal* court felt that any interpretation, other than a literal one, would undermine the reliance that the credit community placed in the filing requirements. 557 F.2d at 23; *accord, Sequoia Machinery, Inc. v. Jarrett*, 410 F.2d 1116 (9th Cir. 1969).

**10.** Brooklyn, Inc. sold primarily to retail outlets in Brooklyn, Alsted to retail outlets in Suffolk and Arthur's to gas stations and repair shops in Nassau.

their own customers separately. Moreover, the Trustee established that Brooklyn, Inc. had closed down in 1978 before Purolator ever became a customer of Alsted and that Alsted had then purchased Brooklyn, Inc.'s remaining inventory at market rates. Finally the Trustee established that drop-shipping was a common practice in the trade which Alsted utilized with several of its unaffiliated customers.[11]

In sum, the Trustee established that, regardless of what a first time customer looking at Alsted's advertisements might have thought, a customer of Brooklyn, Inc. or Arthur's was a customer of only Brooklyn, Inc. or Arthur's, purchasing a part which came from their inventories only. Moreover, if either enterprise did not have the part in stock, it would have purchased it from Alsted—or from any other warehouse—and then resold it to the customer. There was no evidence, however, with the possible exception of isolated instances, that Alsted ever sold any of its inventory at or out of Brooklyn, Inc. or Arthur's.

Consequently, the Court finds that, unless the corporate veil between Alsted, Brooklyn, Inc. and Arthur's can be pierced, Ford has established only that Alsted created the mere appearance of doing business at Brooklyn, Inc. Purolator, on the other hand, due to Brooklyn, Inc.'s closing down prior to Purolator becoming a supplier of Alsted, has established nothing. Accordingly, the Court finds the facts of this case more nearly those of *P.S. Products* and *Uniroyal* than *Mimshell.*

### V.

In addition to trying to establish that Alsted directly sold its inventory out of Brooklyn, Inc. or Arthur's, the defendants asked the Court to pierce the corporate veil between Alsted, Brooklyn, Inc. and Arthur's and thereby find that Alsted had a place of business at more than its Suffolk County location.

In that the issue present here is not one of imposing corporate liability on its shareholders, the Court understands this argument as an attempt to invoke by analogy the "doing business" test under section 301 of the New York Civil Practice Law and Rules ("CPLR"). *See* N.Y.Civ.Prac.Law § 301 (McKinney 1972).

The case law under section 301 indicates that a corporation not doing business within New York will nevertheless be deemed to be doing business within New York, and accordingly held subject to the jurisdiction of the New York Courts, by virtue of the acts of a subsidiary corporation which is doing business within New York under one of two circumstances: 1) by piercing the corporate veil; or 2) by finding an agency relationship. N.Y.Civ.Prac.Law, § 301, commentary at 6–7 (McKinney 1972); *accord, Furman v. General Dynamics Corp.,* 377 F.Supp. 37, 41 (S.D.N.Y.1974).

Assuming, *arguendo,* that the goals of these two tests (*i.e.,* the doing business test under CPLR § 301 and the place of business test under U.C.C. § 9–401(1)(c)) are sufficiently similar to justify the employment of the former as part of the latter, *cf. In re McQuaide,* 5 U.C.C. 802, 806–07 (B.C. D.Vt.1968), the Court finds that the defendants have failed to satisfy the doing business test under CPLR § 301.

▮ To pierce the corporate veil, the defendants must establish that the subsidiary has no independent existence, being, in reality, a mere instumentality or department of the parent. *N.Y.Civ.Prac.Law* § 301, commentary at 6–7 (McKinney 1972); *see Public Administrator v. Royal Bank of Canada,* 19 N.Y.2d 127, 224 N.E.2d 877, 278 N.Y.S.2d 378 (1967); *Taca International Airlines, S.A. v. Rolls-Royce of England, LTD.,* 15 N.Y.2d 97, 204 N.E.2d 329, 256 N.Y.S.2d 129 (1965); *Murray v. Plessey Incorporated,* 40 A.D.2d 811, 338 N.Y.S.2d 311 (1st Dep't 1972) (*per curiam*).

In the case at bar, however, the evidence established that Alsted, Brooklyn, Inc. and

---

**11.** In other words, whenever Alsted had a sufficiently large customer, rather than having the parts delivered to Farmingdale, reloaded on its trucks and shipped to the customer, it would notify the supplier to ship the goods directly to the customer.

Arthur's were independent, profit motivated enterprises which maintained their separate integreties. No inventory was freely transferred as in *Royal Bank, supra*; nor was any "a mere sales agent" for the others, *cf. Taca, supra.*

On the other hand, to establish an agency relationship under CPLR § 301 as applied analogously to U.C.C. § 9–401(1)(c), the defendants, at a minimum, must establish that some entity, which had a place of business in a county other than Suffolk, was regularly soliciting business for Alsted, or had the authority to contractually bind Alsted. *Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 227 N.E.2d 851, 281 N.Y.S.2d 41, *cert. denied,* 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967); *Miller v. Surf Properties, Inc.,* 4 N.Y.2d 475, 151 N.E.2d 874, 176 N.Y.S.2d 318 (1958); *Sheldon Estates, Inc. v. Perkins Pancake House, Inc.,* 48 A.D.2d 936, 369 N.Y.S.2d 806 (2d Dep't 1975); *Simonson v. International Bank,* 16 A.D.2d 55, 225 N.Y.S.2d 392 (1st Dep't 1962), *aff'd,* 14 N.Y.2d 281, 200 N.E.2d 427, 251 N.Y.S.2d 433 (1964); *cf. Delagi v. Volkswagenwerk AG,* 29 N.Y.2d 426, 278 N.E.2d 895, 328 N.Y.S.2d 653 (1972); *accord, McShan v. Omega Louis Brandt et Frere, S.A.,* 536 F.2d 516 (2d Cir. 1976); *Baird v. Day & Zimmerman, Inc.,* 390 F.Supp. 883 (S.D.N.Y.1974), *aff'd without opinion,* 510 F.2d 968 (2d Cir. 1975); *Marantis v. Dolphin Aviation, Inc.,* 453 F.Supp. 803 (S.D.N.Y.1978); *Freeman v. Gordon and Breach, Science Publishers, Inc.,* 398 F.Supp. 519 (S.D.N.Y.1975); *Furman v. General Dynamics Corp.,* 377 F.Supp. 37 (S.D.N.Y.1974).

Again, in the case at bar, the evidence established that neither Brooklyn, Inc. nor Arthur's regularly solicited sales for Alsted, nor had they the authority to contractually bind it.

### Conclusion

Accordingly, the Court finds that the Trustee has established that Ford and Purolator failed to properly perfect their security interests, and therefore, is entitled to a judgment declaring them subordinate to his interest.

Settle judgment.