**In re STERLING WOOD PRODUCTS, INC., Debtor.**

**Bankruptcy No. 182–11962–21.**

United States Bankruptcy Court, E.D. New York.

Sept. 23, 1983.

**184**

Robert P. Herzog, New York City, for trustee.

Andrew D. Taylor, Jr., Taylor & Buckley, Charlotte, N.C., for claimant.

### DECISION

CECELIA H. GOETZ, Bankruptcy Judge.

The trustee in bankruptcy of Sterling Wood Products, Inc. ("Sterling") is moving pursuant to §§ 502, 544 and 545 of the Bankruptcy Code (11 U.S.C. §§ 502, 544 and 545) to reclassify a claim of Michael Weinig, Inc. ("Weinig") from a secured claim to a general unsecured claim. Additionally, the trustee seeks to preserve the voided lien for the benefit of the estate, pursuant to § 551 of the Code (11 U.S.C. § 551).

The trustee's right to relief turns on whether or not Sterling had "a place of business" within the meaning of § 9–401 of the New York Uniform Commercial Code ("NYUCC") in more than one county in the State of New York. If Sterling did, then Weining properly perfected its security interest by its single filing of a financing statement with the Secretary of State in Albany, New York. If, however, Sterling had "a place of business" only in the County of Kings, then Weinig's filing is defective because no financing statement was filed with the County Clerk's office of that county.

### FINDINGS OF FACT

Because of the importance the parties evidently attach to certain facts the Court has made findings respecting them with the result that the findings which follow are more elaborate than they would be if limited to those facts which the Court deems relevant.

Before the debtor Sterling filed a petition for relief under the bankruptcy laws on August 3, 1982, it had been engaged for over forty years in the business of manufacturing wood molding which it sold to architectural millworks and to display, furniture and picture frame manufacturers. It carried on that business at 435 East 101st Street, Brooklyn, Kings County, New York.

Sterling bought machinery for its operations from Rudolf Melde, whose company Advanced Machinery, Inc. ("Advanced") acted as a sales agent for several manufacturers, including the claimant herein, Weinig. Over the years Melde sold many machines to Sterling.

Although Sterling's business was largely concentrated in the New York Metropolitan area, Sterling sold to and solicited business from customers in counties throughout the entire State of New York, in New Jersey and Connecticut, and as far south as Miami, Florida, and as far west as California. It also sold abroad. Out of Sterling's 200–300 customers, less than 100 were located within Kings County. Sterling had four incoming and outgoing telephone lines in addition to a telex for overseas sales.

Three salesmen, who spent all but approximately one-half day a week outside Sterling's Brooklyn office, did not live in Brooklyn and were paid on the basis of commissions, accounted for approximately 60 percent of the gross sales of the debtor. The salesmen would call on customers in Connecticut and New Jersey. For a short period of time Sterling sold a product, not part of its regular product line, through an outside sales agency, Wood Technology, located in New Jersey, and an associated concern, Marvin Walker Associates, with premises in Atlanta, Georgia.

Sterling made deliveries with its own trucks and its own drivers of less than full truckloads as far as a two-hour ride from its Brooklyn, Kings County, New York loca-

tion; if the delivery was further than a two-hour ride, it had to have a full truckload of goods.

Sterling purchased its lumber from all over New York, the midwest and the south.

In January, 1979, Sterling organized a subsidiary, Leslie Lumber Co., Inc. ("Leslie") intending to have that company kiln-dry its lumber.

Leslie's business was located in Orange County, New York: its address was Houston Street, Post Office Box L, Maybrook, Orange County, New York.

When Leslie was organized, Sterling was either buying its lumber green and having it kiln-dried by custom kiln-drying operators or was buying it already dried. A kiln-dry operation previously carried on by Sterling had been discontinued some time previously.

Leslie, in addition to kiln-drying, also prepared lumber by cutting, ripping, planning and trimming it. After Leslie began operations, Sterling transferred to Leslie's premises machinery capable of carrying out such processing, including a planer, four or five circular cross-cut saws, three fork lift trucks and other equipment.

Among the machinery which Sterling arranged to send to Leslie was a planer which it bought directly from Kupfermuehle Appliances through Melde. Although the machine was bought and paid for by Sterling and financed by it through the seller, it was delivered directly to Leslie's premises in Maybrook. Parts for this machine were invoiced and paid for by Sterling, although shipped directly to Maybrook.

Sterling's plan to have Leslie kiln-dry its lumber was abandoned some time after Leslie was organized because Sterling could no longer afford to buy lumber directly from the mill. As a result, all kiln-drying done by Leslie was for customers other than Sterling. Until that time about 30 percent of Leslie's kiln-drying had been performed for Sterling and 70 percent for other companies. About 80 percent of Leslie's income came from kiln-drying.

Following Leslie's entry into business, the greater portion of the preparation and dressing of lumber formerly done entirely in Brooklyn by Sterling was now done for it by Leslie. But Sterling continued to do some of this work itself.

Leslie did similar work for other companies, using Sterling machinery. About 40 percent of the wood processing performed by Leslie was done for Sterling and about 60 percent for other companies.

When Leslie was organized, one of Sterling's employees went to work for the new company. Sterling also used the premises of Leslie to store about 30 to 40 percent of its lumber. Nearly 100,000 feet of Sterling lumber was being stored on Leslie's premises when Sterling went into bankruptcy. Sterling's lumber inspector, Tafuro, moved to Maybrook in 1979 to take charge of that inventory and oversee deliveries.

On three occasions, Grbic, Sterling's plant manager, visited Maybrook to work on machinery belonging to Sterling and to provide technical advice and counsel. Leslie was billed, but did not pay, for his services.

Ronald Weiner, who was president of Sterling, became president of Leslie and from the time Leslie was organized, divided his time between the two companies, generally spending Tuesdays and Thursdays at Leslie. Only Sterling paid him a salary.

While at Leslie's premises Weiner received telephone messages and calls from Sterling's employees in Brooklyn, if "absolutely necessary." Weiner would, if required, return calls to customers and creditors from Leslie's premises and even give rough price quotes from there on Sterling products. He also made telephone calls regarding Sterling on his car phone.

Melde, who has known Weiner for ten years, was aware that Weiner could be reached at Leslie, often called him there and went to Leslie's premises on several occasions to discuss with Weiner the machinery owned by Sterling and the purchase by Sterling of additional machinery.

Sterling financed Leslie by guaranteeing loans made Leslie by the Marine Midland

Bank, N.A. ("Marine Midland"). Because of the common ownership of Leslie and Sterling, Marine Midland would not finance invoice and accounts receivable owed by Leslie to Sterling viewing them as "in-house receivables". Marine Midland filed with the Clerk of Orange County two UCC–1 financing statements, given it by Sterling and signed by Sterling's president, respecting property located on the premises of Leslie. These statements covered respectively a wood waste boiler and all inventory, machinery, etc. belonging to Sterling on those premises. On both statements, plus their attachments, Sterling's address is shown as Houston Street, Post Office Box L, Maybrook, New York.

Leslie's books and records were kept in Brooklyn and prepared by the bookkeeper employed and paid by Sterling. Both firms used the same accountants who were paid separately by each firm.

Sterling's and Leslie's payroll were both prepared in Brooklyn. Leslie's payroll was delivered weekly to Maybrook by mail, a Sterling employee or Weiner and paid by checks drawn on Leslie's bank account.

Sterling's mail went exclusively to Brooklyn; Leslie's mail was sent both to Brooklyn and to Maybrook. Sterling's telephone number was registered only in its own name and only for the Brooklyn address; Leslie's telephone number was registered only in its own name and only for the Maybrook address. Sterling's telephone was answered, "Sterling Wood"; Leslie's telephone was answered, "Leslie Lumber" or "2116" because another firm used the same premises. Sterling's office personnel, attorneys, accountants and some creditors knew the Maybrook telephone number. Sterling's invoices carried only its Brooklyn address; Leslie's invoice showed both Maybrook and Brooklyn as its addresses.

Sterling's and Leslie's W–2 forms, federal identification numbers, sales tax certificates, and income tax filings were all maintained separately.

Because of the difference in what each company was selling, Leslie and Sterling had different customers and likewise had few creditors in common. Each company billed its own sales and payments were made by and to it out of each company's own account.

Sterling paid Leslie for the services Leslie performed for it, kiln-drying, storing and processing wood.

Sterling's gross sales averaged $3 to $4 million annually and it had fifty employees. Leslie paid Sterling for wood waste and trucking.

Sterling delivery trucks regularly delivered lumber parts and wood waste products from Brooklyn to Maybrook and returned with kiln-dried and processed lumber.

In sum, Sterling did business with Leslie and, more particularly, furnished trained employees, extensive wood processing equipment, guaranteed loans, did the books and payrolls, performed certain technical operations and used Leslie's property to store large amounts of Sterling's inventory.

Some time in 1981, Sterling purchased from Weinig through Melde a Unimat 17 A–3 molder. Weinig filed a financing statement respecting this machine in Albany with the New York Secretary of State and also in the Office of the County Clerk for the County of Kings.

Later, in April, 1982, Sterling purchased a Unimat 17 A–3 molder from Weinig through Melde acting as agent for Weinig. Weinig filed two UCC–1 financing statements covering this Unimat 17 A–3 molder in Albany with the New York Secretary of State but made no filing with the Office of the County Clerk in the County of Kings.

Weinig's office in Charlotte, North Carolina prepared the security agreement, financing statement, trade acceptances and invoices covering the Unimat 17 A–3 molder. On all these documents the only place of business shown for Sterling is Brooklyn, New York.

When Sterling made the purchase of the Unimat 17 A–3 molder it was contemplating moving its entire operation from Brooklyn to Maybrook some time in July, 1982 and so advised Weinig. Melde was told

that the Unimat 17 A–3 molder would be included in the move. He relayed this information to Weinig's employees.

Sterling intended to close down its operation in Brooklyn and transfer its business to Maybrook in order to reduce overhead. Some customers and creditors were informed of this contemplated move including various representatives of Weinig in North Carolina.

In June, 1982, some of Sterling's customers and creditors were given the Maybrook telephone number as the place to reach Sterling after July 1, 1982.

Early in 1982 Sterling's plant manager moved to Orange County to act as plant manager for Leslie. Leslie began building a tool room for Sterling in expectation of this move.

Sterling never moved its operation to Maybrook because both companies went out of business on July 28, 1982. At the time they filed for relief Leslie owed Sterling nearly one and a half million dollars and the failure of its operation caused the failure in bankruptcy of Sterling because Sterling was so involved with Leslie.

From the time of its organization Leslie lost $15,000 to $20,000 a month.

It was public knowledge, open and notorious and known by anybody who was interested, and to many customers of Sterling, that Leslie was a subsidiary of Sterling and that it operated in Maybrook, Orange County, New York.

There is no evidence that the premises of Leslie were known by the creditors or customers of Sterling to be a place of business of Sterling.

Sterling had only one place of business in New York State and that was in Brooklyn, New York. Sterling did not have a place of business in Orange County, New York, or anywhere else in New York, other than Brooklyn, New York.

## DISCUSSION

The issue before the Court is whether the debtor has one, or more than one, place of business in New York State. This is be-cause local filing of a UCC financing statement is only required by NYUCC § 9–401(1)(c) where the debtor, "has a place of business * * in only one county of this state." The pertinent language reads:

"(1) The proper place to file in order to perfect a security interest is as follows:

\* \* \* \* \* \*

"(c) ........ in the department of state and in addition, if the debtor has a place of business in this state and in only one county of this state, also in the office of the filing officer of such county."

Thus, if the debtor had only one place of business, in Brooklyn, as alleged by the trustee, Weinig was required to file the financing statement covering its automatic molder both with the Secretary of State in Albany and with the County Clerk of the County of Kings. If, on the other hand, the debtor had more than one place of business, as alleged by Weinig, in Orange County, or elsewhere, in addition to Brooklyn, then Weinig perfected its security interest in the machine by the single filing in Albany.

The Uniform Commercial Code does not define "a place of business." Giving content to that phrase has not proved to be easy. One reason may be that while the requirement for local filing is intended "to preserve the convenience of local filing for the benefit of potential local creditors," *In re Mimshell Fabrics Ltd.*, 491 F.2d 21, 23 (2d Cir.1974), it is rarely a local creditor who is seeking to invalidate a lien for lack of local filing but more often a trustee in bankruptcy who, when successful, obtains a result which many courts have recognized as harsh. *Uniroyal, Inc. v. Universal Tire and Auto Supply,* 557 F.2d 22, 23 (1st Cir. 1977); *In re Bethlehem Concrete Corp.,* 306 F.Supp. 1047, 1049 (E.D.Pa.1969); *In re Mauck,* 378 F.Supp. 904, 906 (W.D.Va.1974). Although the 1st Circuit has disapproved fashioning "equitable solutions to mitigate the hardship on particular creditors of literal application of statutory filing requirements" (*Uniroyal, Inc. v. Universal Tire and Auto Supply, supra,* 553 F.2d at 23) the

desire to avoid such hardship may have influenced other courts in the interpretation given the ambiguous phrase, "a place of business."

The reason lying behind the requirement for local filing where a debtor has only one place of business, was expounded as follows by the 2d Circuit in *P.S. Products Corp. v. Equilease Corp.,* 435 F.2d 781, 783 (2d Cir. 1970):

> "Creditors dealing with local firms with a place of business in only one county are supposed to be able to avoid the trouble of a search of the central records in Albany and are entitled to rely on the records of the county where the debtor is doing business."

Virtually the same explanation was given by a local Federal court of a parallel Pennsylvania statute:

> "Significantly, the legislature consciously selected *dual* filing as opposed to *central* filing only so that the local creditor in the case of a one county place of business need only check the local records and need not check the more distant records in the office of the Secretary of the Commonwealth."

*In re Bethlehem Concrete Corp., supra,* 306 F.Supp. at 1048 n. 2 (Emphasis in original).

Virtually all the courts which have had to deal with the problem have begun by noting, as did the 8th Circuit most recently, that White and Summers in their commentary on the Uniform Commercial Code:

> "describe two plausible tests for use in making the factual determination of what constitutes a place of business: a 'quantity' test, based on how much work was accomplished at a particular location; and a 'notoriety' test which involves the extent to which creditors and others know that the debtor is in fact doing business at the place in question. J. White and R. Summers, *Uniform Commercial Code* § 23–14 (2d ed. 1980)."

*In re McCrary's Farm Supply, Inc.,* 705 F.2d 330, 332 (8th Cir.1983).

The test in New York, as Bankruptcy Judge Hall concluded in *In re Alsted Auto-motive Warehouse, Inc.,* 16 B.R. 926, 430 (Bkrtcy.E.D.N.Y.1982), is "essentially a hybrid of these two tests." He read the leading case of *In re Mimshell Fabrics, Ltd.,* 491 F.2d 21 (2d Cir.1974) and its progeny as requiring an affirmative answer to the following two inquiries before finding a place of business to exist:

> " . . . was the debtor actually doing business at the location in question as evidenced by its frequent use by the debtor in the production of revenue? 491 F.2d at 23 \* \* \* and (2) was such use notorious, i.e., was there some 'class of probable potential creditors (who knew) of the second place of business'? 491 F.2d at 23"

16 B.R. at 929–30 (citations omitted).

The requirement that the existence of a second locale where the debtor did business be notorious arises naturally from the statutory purpose in requiring local filing, which is to accommodate local creditors. Thus, in *P.S. Products Corp. v. Equilease Corp.,* the 2d Circuit refused to deem the location listed in a corporation's Certificate of Incorporation to be "a place of business" on the ground that to do so would frustrate the legislative purpose:

> "To require a creditor to check the Certificate of Incorporation in Albany before relying on local filing records would be to put the creditor to just the kind of inconvenience which the Legislature determined that local creditors should be able to avoid."

435 F.2d at 783.

Patently, a local creditor would be far more inconvenienced if, before he could rely on local filing records, he were required to engage in a careful study and analysis of his corporate debtor's warehousing practices or its relation with its subsidiaries in order to determine if they were of such a character as to make the warehouse or the subsidiary a place of business of the debtor. Unless the debtor has in some way permitted it to become generally known that he is doing business at a place other than that known to his local creditors, they should be able to rely on a local file search.

As District Judge Stewart Jr. noted, in a case involving facts very similar to those present here:

"The importance of the requirement that potential creditors generally be aware of the debtor's use of a premise is underscored by the Official Comment to § 9–401 which states that the policy of subsection (1)(c) is 'to require filing in the place or places where a creditor would normally look for information concerning interests created by the debtor."

*In re Airequipt,* 1 B.C.D. 1494, 1496 (S.D.N.Y.1975).

Under that test, Judge Stewart held that a Bronx subcontractor had not received the requisite notoriety to qualify it as an additional place of business of a Westchester manufacturer although the subcontractor performed preliminary processing, using raw materials provided in part by the debtor and did such work on machines purchased by the debtor but delivered directly to the subcontractor. Moreover, the debtor's personnel, including its sole shareholder, visited the Bronx plant several times a week for periods of an hour or so to check on the quality of its production.

Judge Stewart noted there that there was no evidence that any of the debtor's creditors or customers knew of the company's dealings in the Bronx, except for the firm which sold the debtor the machinery installed at the Bronx location and a single Italian firm with which the Bronx subcontractor carried on correspondence in the name of the debtor. Such evidence fell "short of the general knowledge of 'the class potential creditors' that the concept of notoriety requires." 1 B.C.D. 1496.

Conversely, relatively little use of a second location will qualify it as a place of business where held out as such to customers. Thus in *In re John Henry Adams,* 5 U.C.C. Reporting Service 795 (S.D.N.Y., September 25, 1968, affirmed by the District Court November 13, 1969, unreported), it was held that putting the home telephone number of the debtor's salesmen on their business cards, together with other facts, was sufficient to make the homes of these salesmen additional places of business of the debtor.

Turning to the facts of this case, the concept of notoriety is not satisfied. Arguably to one familiar with all the facts, which few creditors would be, Leslie might be deemed "a place of business" of Sterling. Like the warehouse in *In re McCrary's Farm Supply, Inc., supra,* Leslie's premises "performed an integral part of (Sterling's) business in the (manufacture of wood molding) and was (Sterling's) basic method of business operation and expansion." 705 F.2d at 334.

But totally lacking here is any evidence that Leslie was known to Sterling's creditors as:

"a place where customers and creditors of the debtor would normally resort to or communicate with by mail or otherwise to trade with the debtor or engage in commercial transactions; a place where persons dealing with the debtor would normally look for credit information." *In re McQuaide,* 5 U.C.C. Reporting Service 802, 806 (D.Vt.1968).

What was notorious was that Leslie was a subsidiary of Sterling, as the following testimony of the President of both Leslie and Sterling acknowledges:

Q. How many customers of Sterling knew of the Leslie subsidiary and its operation; if you know?

A. i would say a good proportion of them knew. I mean it was public knowledge; it was within the trade. It's a small world in the area, you know, when an operation of that size is put into operation—who's behind it, what's the story, this kind of thing. It was pretty common knowledge.

Q. You say it was common and notorious to the customers of Sterling?

A. Anybody who was interested. You know, a lot of people weren't but, if anybody was interested would, L would assume, would know.

Q. And would that be true as to the customers of Leslie, *that it was a subsidiary of Sterling?*

A. Yes.

Q. *And that was notorious and well known?*

A. Yes, I would say so.

What was also known was that Sterling was going to move its place of business to Maybrook some time in the future.

But knowledge that Leslie was a subsidiary of Sterling in no way carried notice that it was also a place of business of Sterling. On the contrary the very fact that two separate corporations were involved would mean to most businessmen two distinct places of business. Similarly, the knowledge that Sterling was going to move its place of business to Maybrook some time in the future is inconsistent with knowledge that it was already doing business at that location.

Significantly, no evidence was introduced to contradict the following testimony by Sterling's President and Melde's friend, Ron Weiner:

Q. Did you ever tell Mr. Melde that you had two places of business in this state?

A. Specifically for which company?

Q. For Sterling Wood.

A. No, Sterling Wood Products—Rudy Melde knew that I had Leslie Lumber Company as a separate operation. But Sterling Wood Products was run as Sterling Wood Products of Brooklyn.

Q. There's only one location?

A. Yes.

Q. Do you have any reason to believe that Mr. Melde believed, knew or thought any facts that there were more than one place of business for Sterling?

A. No.

In sum, here just as in *Airequipt, supra,* the concept of notoriety was not met.

Weinig appears to urge alternative grounds to support the single filing. One is that Sterling bought and sold outside the County of Kings. Such an argument was conclusively scotched by the District Court in *In re P.S. Products Corp.,* 7 U.C.C. 411, 425 (E.D.N.Y.1970) *aff'd sub. nom. P.S. Products Corp. v. Equilease Corp., supra,* where the Court said

"... the statute, although it may be intended to provide a special rule for 'local' businesses, is phrased in terms not of locality of scope of business, but of location of a place of business in a county. Even the most seemingly local businesses are likely to have connections with interstate commerce. The important question for a creditor is not how widespread are his debtor's customers, but does the debtor do business with them at his premises in a county in New York or in several counties in New York." (Citations omitted.)

The 2d Circuit agreed, noting that the fact that the bankrupt:

"dealt with customers and suppliers outside of Suffolk County also does not alter the fact that the bankrupt's sole place of business was in Suffolk County, and hence Suffolk County filing was required."

435 F.2d at 783 (footnote omitted.)

There is some suggestion that the Court should find Sterling to be doing business in Maybrook, as well as in Brooklyn, New York by piercing the corporate veil and finding Leslie to be in reality a mere instrumentality or department of its parent. In view of the purposes to be served by the requirements of local filing, the Court is dubious whether it can, or should be, excused where, although the corporation concerned has only a single place of business, it might, through application of a sophisticated legal theory, be found to have places of business elsewhere. Assuming, however, that it might be appropriate to pierce the corporate veil, there are no reasons here for doing so. *Cf. In Re Alsted Automotive Warehouse, Inc., supra,* 16 B.R. at 931–932.

## CONCLUSION

Accordingly the Court finds that the trustee has established that Weinig failed to

perfect its security interest in the Weinig Automatic Molder Unimat 17 A–3, as required by NYUCC § 9–401. Such perfection required filing of a financing statement in the County of Kings, the sole county in the State of New York in which Sterling had a place of business. Therefore, the trustee who is given the status of a lien creditor by Section 544 of the Bankruptcy Code is entitled to an order declaring Weinig's interest in the molder subordinate to his own.

In addition, pursuant to 11 U.S.C. Section 551 the trustee is entitled to preserve the voided lien for the benefit of the estate.

Settle Order.