**In re ALITHOCHROME CORPORATION (a New York corporation), Debtor.**

**TRANS UNION LEASING CORPORATION, Plaintiff,**

v.

**ALITHOCHROME CORPORATION (a New York corporation), Defendant.**

Bankruptcy No. 82 B 10335.
Adv. No. 5572–A.

United States Bankruptcy Court, S.D. New York.

June 27, 1983.

Gilmartin, Poster & Shafto, New York City, for plaintiff.

Stroock & Stroock & Lavan, New York City, for defendant.

Platzer & Feinberg, New York City, for Creditors' Committee.

## DECISION ON TRIAL OF ISSUES

EDWARD J. RYAN, Bankruptcy Judge.

On February 23, 1982 Alithochrome Corporation (Alithochrome) filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. The debtor was continued in possession of its property and in operation of its business pursuant to Section 1107 of the Bankruptcy Code.

Prior to March 17, 1980 Alithochrome was a New York corporation engaged in the business of four color sheet fed lithography with its sole plant and offices at 280 Oser Avenue, Hauppauge, New York (the Hauppauge Plant). During this time all of Alithochrome's printing presses were sheet fed which are less economical than roll or web fed presses for longer printing runs.

In 1979, Alithochrome decided to expand its business and increase its capabilities by ordering a web fed printing press from the Harris Corporation (the Harris Press). Alithochrome acquired an option to lease a nearby building for the purpose of housing the Harris Press. In October, 1979 Trans Union Leasing Corporation (Trans Union) agreed to finance Alithochrome's purchase of the Harris Press, and Alithochrome granted Trans Union a purchase money security interest in it. Trans Union filed U.C.C. Form 1 financing statements in the offices of the New York Secretary of State and the Clerk of Suffolk County.

After ordering the Harris Press, Alithochrome learned that the assets of General Offset Printing Co., Inc. (GOP), a subsidiary of Walter Kidde Co. were available for purchase. GOP's plant, primarily a web facility, was located at 157 Chestnut Street, Springfield, Massachusetts (the Springfield Plant). To accomplish the purchase of assets, ALC Holdings, Inc., a wholly owned subsidiary of Alithochrome was created on March 12, 1980. On March 17, 1980 ALC Holdings, Inc. acquired the assets of GOP. On April 14, 1980 the name of ALC Holdings, Inc. was changed to General Offset Printing Co., Inc. (General Offset). General Offset was at all times a wholly owned subsidiary of Alithochrome.

It was decided that the Springfield Plant would remain a web printing facility and the Hauppauge Plant would continue to be solely a sheet fed printing plant. Accordingly, Alithochrome canceled its lease option on the premises that were intended to hold the Harris Press, incurring a $20,000 penalty and obtained Trans Union's permission to locate the Harris Press in Springfield. On April 18, 1980 Trans Union filed an amendment to the financing statement filed in the office of the New York Secretary of State stating that "the equipment will be located on the premises of Alithochrome Corporation D/B/A General Offset

Printing Co., Inc. at 157 Chestnut Street, Springfield, Massachusetts 01101." Thereafter U.C.C. Form 1 financing statements for the Harris Press were filed in the office of the Massachusetts Secretary of State and with the Hampden County Registry of Deeds.

One of the assets acquired from GOP was GOP's contract, dated March 2, 1979, with George Hantscho Company, Inc. for the purchase of a Mark VI web fed printing press (the Hantscho Press). Delivery and installation of the Hantscho Press at the Springfield Plant commenced on March 17, 1980. In June, 1980 Trans Union agreed to finance the purchase of the Hantscho Press.[1] The proceeds of this loan were disbursed by Trans Union at Alithochrome's direction (a) to repay Walter Kidde Co. for the payment GOP made to the manufacturer of the press, George Hantscho Company; (b) to pay to George Hantscho Company the balance due and owing; and (c) the balance to Alithochrome. With regard to the Hantscho Press, Trans Union filed U.C.C. Form 1 financing statements in the following offices: the Clerk of Suffolk County, New York, New York Secretary of State, Hampden County Registry of Deeds and the Massachusetts Secretary of State.

Pursuant to Mass.Gen.Laws Ann. ch. 106, § 9–401(1)(c) (1979) if Alithochrome maintained a "place of business" at 157 Chestnut Street, Springfield, Massachusetts during the period March 17, 1980 to August 8, 1980,[2] a local U.C.C. filing against Alithochrome with the Clerk of the City of Springfield would have been required to perfect a security interest in the Harris and Hantscho Presses. Trans Union made no such filing.

■ For a location to qualify as a place of business for purposes of U.C.C. 9–401(1)(c) the debtor must actually conduct business at the location. *Uniroyal Inc. v. Universal Tire & Auto Supply Co.,* 557 F.2d 22 (1st Cir.1977); *P.S. Products Corp. v. Equilease Corp.,* 435 F.2d 781, 783 (2d Cir. 1970). An occasional use or occupation of a premises is not sufficient to constitute it as a place of business. *See In re McQuaide,* 5 U.S.C. 802, 807 (Bankr.D.Vt.1968).

In *P.S. Products Corp.,* the debtor maintained its only place of business in Farmingdale, Long Island, New York, in Suffolk County. All its machinery and equipment were located there along with its offices and telephones. Because Farmingdale is located predominately in Nassau County and only a small part of that town is within the borders of Suffolk County, the secured party apparently assumed the debtor was located in Nassau County. Thus a Financing Statement was filed with the County Clerk of Nassau County and with the Secretary of State in Albany.

The debtor's Certificate of Incorporation showed Nassau County as the debtor's location. Additionally, the debtor was listed in the Nassau County telephone book, leased a post office box in Nassau County and dealt with customers and suppliers outside of Suffolk County.

The secured party contended that the debtor should be deemed to have a place of business in Nassau County. The court rejected this argument, holding that actual business must be conducted at a location for it to be considered a place of business for purposes of U.C.C. 9–401(1)(c). Thus, the term "place of business" must be construed in terms of business realities. *See In re Carmichael Enterprises, Inc.,* 334 F.Supp.

1. The parties vigorously dispute who holds legal title to the Hantscho Press. Trans Union claims that Alithochrome holds title, and the debtor maintains that General Offset holds title. However, Alithochrome and General Offset each had a single place of business in Massachusetts. Therefore, a local filing would be required to perfect a security interest in the Hantscho Press in either event. No such local filing was made, so this court need not decide the dispute as to ownership of the Hantscho

Press and for purposes of this opinion will assume that Alithochrome owned the Hantscho Press.

2. In May, 1981 Alithochrome closed its Hauppauge Plant and moved its entire printing operation to the Springfield Plant. The name of General Offset was changed to Alithochrome Corporation by certificate of amendment filed in Delaware on May 29, 1981.

94, 100 (N.D.Ga.1971), *aff'd,* 460 F.2d 1405 (5th Cir.1972).

■ Actual business operations alone are insufficient to render a location a "place of business". Operations at the location must be sufficiently notorious so that the class of probable, potential creditors are aware of the place of business. *In re Mimshell Fabrics, Ltd.,* 491 F.2d 21 (2d Cir.1974). This class of potential creditors are those who deal with the debtor and includes creditors, customers and people in the trade. *Id.; In re Airequipt,* 1 B.C.D. (CRR) 1494 (S.D.N.Y. September 19, 1975). Thus, in *In re Airequipt* although the debtor operated machinery and had personnel regularly visit a second location the District Court affirmed the finding that this location was not a place of business because there was insufficient evidence of the debtor's creditors or customers knowledge of the debtor's dealings at that location.

■ In the case at bar, the evidence compels the conclusion that Alithochrome maintained a place of business in Springfield during the period in question. Therefore, Trans Union's security interests in the Harris and Hantscho Presses are unperfected.

It is clear that Alithochrome actually conducted business at the Springfield Plant on a regular basis during the period in question. Robert Heller, then Vice President of Alithochrome (and Chairman of the Board of General Offset) regularly spent Wednesday afternoon, Thursday and Friday of each week in the Springfield plant where he occupied an office used exclusively by him. While at the Springfield plant, Mr. Heller attended to the business of both the Springfield and Hauppauge facilities. He received phone calls from employees, customers and suppliers of the Hauppauge Plant, and he dealt with production problems, sales orders, prices and work flow relating to the Hauppauge Plant.

Alithochrome permitted its Harris Press to be installed and used at the Springfield Plant, and in addition stored sheet paper and equipment there. The Springfield plant performed web printing and binding for Alithochrome's customers. Also, General Offset personnel accepted orders for sheet fed printing jobs which were printed at the Hauppauge Plant. Approximately 20% of the work printed in Hauppauge in 1980 consisted of jobs accepted by the Springfield Plant. General Offset's purchasing agent ordered supplies for the Hauppauge Plant.

Alithochrome's operations in Springfield were well known to those in the printing trade. Immediately after the acquisition, Alithochrome represented to customers and suppliers that Alithochrome acquired a web facility in Springfield. There was testimony that Alithochrome's suppliers and customers visited the Springfield Plant and regarded it as Alithochrome's facility. Alithochrome's customers solicited quotes and placed orders with Alithochrome for web printing jobs, knowing that the jobs would be printed in Springfield. The invoices for that work were sent to Alithochrome's customers from its Hauppauge Plant. Suppliers of Alithochrome shipped supplies to the Springfield Plant and invoiced Hauppauge for these materials.

Shortly after the acquisition a letter was sent to GOP's suppliers stating that GOP had "merged" with Alithochrome. While this is not an accurate legal description of the transaction, it served to notify those in the trade of Alithochrome's presence in Springfield.

Additionally, the phone in Springfield was answered "Alithochrome/General" or "General/Alithochrome." The sign outside the Springfield Plant read "General Offset, a subsidiary of Alithochrome." Alithochrome's advertising held out Alithochrome as having "two modern plants" and contained a picture of the Springfield Plant with a description of it as the "web facility." All of the U.C.C. Form 1 financing statements filed by Trans Union against Alithochrome in Massachusetts show the Springfield address as Alithochrome's mailing address or identify Alithochrome as "D/B/A General Offset Printing Co., Inc."

The policy behind U.C.C. 9–401 is to require filing in the place or places where a

creditor would normally look for information concerning interests created by the debtor. *Uniform Commercial Code § 9–401, Official Comment.* Any potential creditor of Alithochrome would be aware that the Springfield Plant was Alithochrome's sole presence in Massachusetts. Any such creditor searching the files of the Clerk of the City of Springfield would find no indication of Trans Union's purported security interest in the Harris and Hantscho Presses.

The seemingly harsh decision reached herein results from Trans Union's failure to meet the mild burden of making a local filing. The certainty and reliability of statutory filing must be respected and maintained.

In conclusion, Alithochrome actually conducted business at the Springfield Plant on a continuing basis. This use was known to those with whom Alithochrome dealt. Alithochrome maintained a single place of business in Massachusetts within the meaning of U.C.C. 9–401(1)(c) in Springfield, Massachusetts, and local filing was necessary.

Settle an appropriate order.