**In re WOODFIELD FURNITURE CLEARANCE CENTER OF SUFFOLK, INC., Debtor.**

**Bankruptcy No. 089–90355–21.**

United States Bankruptcy Court, E.D. New York.

June 27, 1989.

Nachamie, Hendler & Spizz, New York City by Barton Nachamie, for debtor.

Feltman, Karesh, Major & Farbman, New York City by Edward Weissman, and Jill Levi, for Chrysler First Wholesale.

OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

In this voluntary Chapter 11 proceeding, Chrysler First Wholesale Credit, Inc. ("Chrysler") has moved by Order to Show Cause, pursuant to Section 362(d), for an order terminating the automatic stay imposed by Section 362 of the Bankruptcy Code. It asked for relief on the ground that its security interest in the assets of the debtor, Woodfield Furniture Clearance Center of Suffolk, Inc. ("Woodfield–Suffolk") lacks adequate protection. Woodfield–Suffolk opposed the motion alleging that Chrysler's security interest was improperly perfected and, therefore, its lien is avoidable by Woodfield–Suffolk in its capacity as a debtor-in-possession.

Woodfield–Suffolk claims that Chrysler failed to perfect its security interest because it filed a financing statement solely with the Secretary of State of New York in Albany and did not file as well in the County of Suffolk where Woodfield–Suf-

folk claims it maintained its sole place of business.

Chrysler has responded that the sole filing in Albany satisfied the requirements for perfection in New York because Woodfield–Suffolk had places of business in at least two counties: Suffolk and Queens. If so, the single filing with the Department of State perfected Chrysler's security interest. Since Woodfield–Suffolk does not dispute Chrysler's right to relief if it in fact holds a perfected lien the sole question before the Court on which the Court held a full evidentiary hearing is: Did Woodfield–Suffolk maintain a place of business in any county other than Suffolk when Chrysler filed its financing statement in Albany.

The answer to that question turns on whether a retail furniture outlet which was operating in the County of Queens when Chrysler filed its financing statement was a place of business of Woodfield–Suffolk. Or, whatever the answer to that question, was Woodfield–Suffolk's collateral subject to a constructive trust because of the representations made by its principal to Chrysler on which Chrysler relied in filing solely with the Secretary of State?

## FINDINGS OF FACT

1. In 1972 Charles Boneparth opened a retail furniture outlet under the name "Woodfield Furniture Clearance Center of Suffolk, Inc." ("Woodfield–Suffolk") in Medford, on Route 112. The name "Woodfield" had been employed by him in earlier furniture businesses. Boneparth had been selling furniture for over 40 years; for approximately 25 years he had been operating through various corporate vehicles, all of which contained as part of their name the word "Woodfield."

2. Boneparth obtained financing for Woodfield–Suffolk from Westinghouse Credit Corporation ("Westinghouse") with which Woodfield–Suffolk entered into a security agreement on August 18, 1982. (Ex. C–2) Westinghouse filed a UCC–1 financing statement both with the Secretary of State in Albany and with the appropriate Suffolk County filing officer, thereby perfecting its security interest. The financing statement was assigned Number 134,821. (Ex. C–3).

3. In July 1986, just before Boneparth embarked on a major expansion of his operations, Westinghouse assigned its security interest in Woodfield–Suffolk's collateral to Chrysler First Wholesale Credit, Inc. ("Chrysler").

4. Within the next year Boneparth organized two new corporations, Woodfield Furniture Factory Outlet, Inc. ("Factory Outlet") and Woodfield Furniture of Florida, Inc. ("Woodfield–Florida"), and opened four new retail outlets: in Farmingdale on Route 110 in Suffolk County; in Monticello in Sullivan County; in Flushing in Queens County, and in Florida. The Florida store was opened in the spring of 1987, the other retail outlets in 1986. The record does not disclose exactly when the Farmingdale store was opened, but it preceded the opening of the Flushing store.

5. After Boneparth advised Chrysler that the Monticello store, which opened in the Summer of 1986, would be operated by a new corporation, Factory Outlet, Chrysler prepared a new security agreement to which the signatories were Woodfield–Suffolk and Factory Outlet. Boneparth signed the new security agreement as President of Woodfield–Suffolk and as President of Factory Outlet. (Ex. C–5).

6. Paragraph 5(h) of the new agreement required each signatory to:

Notify [Chrysler] ten (10) days in advance of Dealer's establishment or purchase of any new corporation, partnership, business entity, or business location for the sale of Inventory and execute such documents as [Chrysler] shall require to convey to it a first perfected security interest in the Collateral pertaining to such new corporation, partnership, business entity or business location."

(Exhibit C–5, p. 2).

7. The new security agreement was executed October 3, 1986 and Chrysler filed a new financing statement within a week covering Factory Outlet registering it in Albany and in Sullivan County. (Ex. C–7).

8. Chrysler requested the new security agreement because it had been informed by Boneparth that intercorporate transfers of inventory among his various stores would be taking place. (Tr., May 10, 1989, p. 12).

9. On November 1, 1986 a new retail furniture store was opened by Boneparth on 37-14 Main Street, Flushing, Queens County, in space leased by Factory Outlet. The new store was advertised to the public as the newest outlet for "Woodfield Furniture" described as "New York's largest furniture closeout specialist." In a large advertisement, next to a large oval containing the words "New York's Largest Furniture Closeout Specialist 'Woodfield Furniture'" were listed the addresses of the four stores in: Flushing, Farmingdale, Medford and Monticello. (Ex. C-8).

10. Chrysler's representatives picked up a copy of this advertisement when they visited the Flushing store in the course of their employment.

11. During that visit, Boneparth told representatives of Chrysler that the Flushing location was being operated by Woodfield-Suffolk. (Tr., May 10, 1989, pp. 15, 17). In January 1987, based on this advice, Chrysler prepared new security documents on UCC Forms which Boneparth signed at the request of Chrysler. (Tr., May 10, 1989, pp. 39, 41).

12. The new UCC-3 Statement which Chrysler filed in Albany on January 26, 1987, both with reference to Financing Statement No. 134,821, were: (1) notice of the assignment to Chrysler of Westinghouse's security interest in the property described in Financing Statement 134,821 (Ex. C-4); and (2) an amendment to the same financing statement, No. 134,821, to include Flushing as a location of Woodfield-Suffolk. Specifically, the Amendment read: "This amendment to include Debtor's additional location at: 37-14 Main Street, Flushing, New York, 11354." (Ex. C-6, p. 1).

13. In April, when Boneparth applied to Chrysler for financing for the new Florida store, several additional documents were prepared based on information given

Chrysler's representatives by Boneparth. Boneparth told Chrysler that the Florida store would be operated by a new corporation, Woodfield-Florida, and not by Woodfield-Suffolk, but that Woodfield-Suffolk would continue to operate the three stores in Flushing, Farmingdale and Medford. (Tr., May 10, 1989, p. 140).

14. Based on this advice an amendment was drawn up to the October 3, 1986 security agreement, adding Woodfield Furniture of Florida, Inc. as a party. This amendment was executed by Boneparth, as President of Woodfield-Suffolk, Factory Outlet and Woodfield-Florida, on April 21, 1987. (First Amendment to Security Agreement—Floor Plan Inventory, Ex. C-5).

15. In addition, Chrysler drew up another amendment to the original UCC Financing Statement, No. 134,821. Chrysler's representatives advised Boneparth that continued financing from Chrysler depended upon his execution of the amendment and Boneparth signed it as President of Woodfield-Suffolk. The language in the amendment to the financing statement, filed on April 23, 1987, reads: "This amendment to include Debtor's additional locations at: 37-14 Main Street, Flushing, New York, 11354, and 1645 Route 110, Farmingdale, New York, 11735." (Ex. C-6, p. 3).

16. In July 1987 Chrysler filed a UCC-3 Continuation Statement with reference to Financing Statement No. 134,821 certifying that it was still in effect. The debtor is identified in that statement as "Woodfield Furniture Clearance Center of Suffolk, Inc., 3130 Route 112, Medford, New York 11763. Additional location: 37-14 Main Street, Flushing, NY 11354." (Ex. C-6, p. 2).

17. Boneparth never advised Chrysler's representatives that the store at 37-14 Main Street, Flushing, New York was not operated by Woodfield-Suffolk, but was operated by Factory Outlet. (Tr., May 10, 1989, p. 100). On each occasion when they inquired he told them that Woodfield-Suffolk was operating the Flushing store. (Tr., May 10, 1989, pp. 135, 137).

18. The expansion of the Woodfield Furniture stores in 1986 led to a laudatory

article in the January 1987 issue of Furnitureworld focusing on Charles Boneparth. The article read in part:

> "Woodfield Furniture has four locations in New York with three opening after 1984—perfection takes time. The store in Medford opened in 1972. In September 1985 the showroom in Farmingdale opened ... The third store opened in July 1986 in the Appollo Plaza Mall in Monticello. The fourth location opened in Flushing in November 1986."

A box in the article lists four locations: Flushing, Monticello, Farmingdale and Medford. Another box headed "Facts Profile" lists four showrooms: Medford, Farmingdale, Monticello, Flushing, and "MAIN WAREHOUSING—58,000 square feet adjacent to Farmingdale location." (Ex. C–12).

19. When Woodfield–Suffolk submitted proof to Chrysler of insurance as required under the security agreement the insured was described as "Woodfield Furniture Center of Suffolk, Inc., 3130 Route 112, Medford, New York, 11763, a/k/a Woodfield Furniture Factory Outlet, a/k/a Woodfield Furniture of Florida, Inc." The date of the certificate is April 30, 1987. The policy described the operations involved as follows: "Furniture Showrooms and Warehouses located at Jacksonville, FL, Route 110, Farmingdale, NY, 1645 Picone Blvd., Bldgs. 1, 4, 6, 7 & 9, 37–14 Main Street, Flushing, NY, 3130 Route 112, Medford, NY, Route 17, Monticello, NY." (Ex. C–13).

20. The various corporate vehicles through which Boneparth operated filed a single consolidated tax return in the name of "Woodfield Furniture Clearance Center of Suffolk, Inc. and subsidiaries." The subsidiaries were identified as "Woodfield Furniture Factory Outlet, Inc." and "Woodfield Furniture of Florida, Inc." (Ex. D–1).

21. There is no evidence that the Flushing store bought any furniture directly from any supplier either in its own name or in the name of Factory Outlet; the only invoices to the Flushing store in evidence show that the furniture shipped to the Flushing store was charged to Woodfield–Suffolk. (Ex. C–9).

22. All books of account for all the Woodfield corporations and all the retail outlets were maintained in a single central office (Tr., May 10, 1989, p. 116); key employees supervised activities at all the various locations (Tr., May 10, 1989, pp. 127–129); and orders taken at any of the outlets were shipped from inventory maintained at the warehouse adjacent to the Medford location. (Ex. C–12).

23. Factory Outlet filed a general business corporation franchise tax report for itself and was issued a poster by the New York State Department of Labor Unemployment Insurance Division. Both the report and the poster listed the Factory Outlet address as Monticello, New York. Factory Outlet also purchased a promotional item, a salad bowl, in its own name and on its own credit. (Exs. D–3, D–12, D–7).

24. The Flushing store had a separate telephone for which it was billed by the New York Telephone Company as "Woodfield Furniture, Inc., 37–14 Main Street, Flushing, New York." (Ex. D–4) Con Edison addressed its bills for the Flushing store to "Woodfield Furniture Factory Outlet, Inc., 37–14 Main Street, Flushing, New York," (Ex. D–13) and the Flushing store maintained a bank account in the name of "Woodfield Furniture Factory Outlet, 37–14 Main Street, Flushing, New York." (Ex. D–10).

25. Approximately 75% of the inventory sold at all the Woodfield outlets was purchased from or through Chrysler. (Tr., May 10, 1989, p. 73).

26. The retail furniture store operated in Flushing was part of the same economic enterprise as Woodfield–Suffolk. It was an integral part of the same business as Woodfield–Suffolk.

27. The retail furniture store at Flushing was a place of business for the economic enterprise operated under the name of the Woodfield–Suffolk which entered into a financing agreement first with Westinghouse and then with Chrysler and which created a security interest in its collateral first in Westinghouse and then in Chrysler.

28. Woodfield–Suffolk had a place of business in 1987 in, at the minimum, two New York counties, Queens and Suffolk.

29. When Chrysler filed its UCC–3 Amendment and continuation financing statements in 1987 with respect to its security interest in Woodfield–Suffolk, Woodfield–Suffolk was doing business in more than one county in the State of New York and, consequently, Chrysler perfected its security interest by filing solely with the Secretary of State in Albany.

30. Chrysler filed only with the Secretary of State because it relied on Boneparth's oral and written representations to it that the Flushing store was a place of business for Woodfield–Suffolk.

31. At the present time there is owed Chrysler between $640,000 and $700,000. The debtor concedes that Chrysler's collateral is worth substantially less than this figure and that it cannot give Chrysler adequate protection for Chrysler's security interest if perfected.

## DISCUSSION

This proceeding is the consequence of the fact that a debtor-in-possession is vested with all the rights and powers of a trustee in bankruptcy. *In re Vintero Corp.*, 735 F.2d 740 (2d Cir.1984), *cert den.*, 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984). He therefore enjoys "all the rights that an ideal judicial lien creditor would have as of the date of the filing of [the Chapter 11] petition." *Vintero*, 735 F.2d at 742, *citing Lewis v. Manufacturers National Bank*, 364 U.S. 603, 605–7, 81 S.Ct. 347, 348–49, 5 L.Ed.2d 323 (1961). This means that a security interest valid as between the debtor and the secured party can be invalidated by the debtor-in-possession if the creditor has failed in any respect to perfect his lien. Since most states, including New York, have adopted the Uniform Commercial Code, this means in practice if there has been a failure to perfect under the provisions of that Code, there is a failure to perfect if a financing statement is not filed in the locales required by the Uniform Commercial Code.

Under the Uniform Commercial Code, adopted in New York, if a debtor operates in more than one county a financing statement need be filed only in Albany. However, if the debtor does business in only one county, a financing statement must be filed with the local county official as well. Dual filing is required for strictly local business.

The pertinent language of N.Y.U.C.C. 9–401(1)(c) reads:

(1) The proper place to file in order to perfect a security interest is as follows:

\*   \*   \*   \*   \*   \*

(c) ... in the department of state and in addition, if the debtor has a place of business in this state and in only one county of this state, also in the office of the filing officer of such county;

N.Y.U.C.C. § 9–401(1)(c) (McKinney, 1986).

In *P.S. Products Corp. v. Equilease Corp.*, 435 F.2d 781, 783 (2d Cir.1970), the Court explained the reason behind the requirement for local filing where a debtor has only one place of business:

Creditors dealing with local firms with a place of business in only one county are supposed to be able to avoid the trouble of a search of the central records in Albany and are entitled to rely on the records of the County where the debtor is doing business.

Thus, if Woodfield–Suffolk operated only in Suffolk, Chrysler's security interest is unperfected because it filed only with the Department of State; however if Flushing was a place of business of Woodfield–Suffolk, Chrysler's lien is good because dual filing was not required. The issue of perfection then turns on the single question: Was the Flushing store a "place of business" of Woodfield–Suffolk?

This is not a case where the secured creditor has filed in the wrong county because of a mistake as to the geographical location of a single enterprise. *See e.g., Uniroyal, Inc. v. Universal Tire & Auto Supply*, 557 F.2d 22 (1st Cir.1977); *P.S. Products, supra*, 435 F.2d 781, *c.f., In re Alstead Automotive Warehouse, Inc.*, 16 B.R. 924 (Bankr.E.D.N.Y.1982).

In such cases it makes no difference what the debtor represented to be the county in which it was doing business, local registration is mandatory. If the creditor failed to file in the correct county, its lien is unperfected.

In this case resolution of whether or not Woodfield–Suffolk was doing business in Queens County as well as in Suffolk does not turn on geography but on economic reality. This case belongs to the small group of cases where it is necessary to decide whether some activity in a geographic area outside the principal place of business of a debtor is an additional place of business. The issue generally arises where something less than the full spectrum of business activities is carried on in the second locale. *In re Sterling Wood Products*, 34 B.R. 183 (Bankr.E.D.N.Y. 1983); *In the Matter of Mimshell Fabrics, Ltd.*, 491 F.2d 21 (2d Cir.1974); *In re Alstead Automotive Warehouse, Inc., supra,* 16 B.R. 926. The Uniform Commercial Code does not define "a place of business" and giving content to that phrase has proved to be difficult.

In *In re Mimshell Fabrics, Ltd., supra,* 491 F.2d 21, the Second Circuit upheld as not "clearly erroneous" that a salesroom operated in the offices of an affiliated company constituted a second place of business although there were no outside physical indicia of the debtor's presence there—the address of the salesroom did not appear on company letterhead, there was no telephone listing for the salesroom, the salesroom was not listed on the building directory and the building manager and elevator operators did not know that the salesroom was there. The Court said:

> ... the fact that Mimshell had New York City operations was widely known among those who dealt with Mimshell which is sufficient to make the M.B.S. offices a "place of business" for the purposes of § 9–401(1)(c).

491 F.2d at 23.

An authoritative text has suggested two plausible tests for use in making the factual determination of what constitutes a place of business:

> ... A "quantity" test based on how much work was accomplished at a particular location; and a "notoriety" test which involves the extent to which creditors and others know that the debtor is in fact doing business at the place in question.

J. White and R. Summers, Uniform Commercial Code, § 23–14 (2d Ed.1980).

In *In re Alstead Automotive Warehouse, Inc., supra,* 16 B.R. at 929, Bankruptcy Judge Hall concluded that the test in New York is "essentially a hybrid of these two tests." He read *Mimshell, supra,* as requiring an affirmative answer to the following two inquiries before finding a place of business to exist:

> ... was the debtor actually doing business at the location in question as evidenced by its frequent use by the debtor in the production of revenue? 491 F.2d at 23.
>
> \*     \*     \*     \*     \*     \*
>
> and (2) was such use notorious, i.e., was there a "class of probable potential creditors [who knew] of the second place of business"? 491 F.2d at 23.

16 B.R. at 929–930 (citations omitted).

However, there is respectable authority, which is steadily growing, which has expressed impatience with any formula, declaring that whether or not a place of business exists is a question of fact to be decided on pragmatic grounds. Thus, the Court of Appeals for the Eighth circuit stated its belief that the determination of what constitutes a place of business "does not involve a conclusion based on an application of a legal standard, but rather involves a finding based on a non-technical statutory standard closely related to practical human experience" and is a question of fact. *In re McCrary's Farm Supply, Inc.,* 705 F.2d 330, 333 (8th Cir.1983). In that case the court concluded that a warehouse even though owned by a company other than the debtor and having only a contractual relationship with the debtor, was a place of business of the debtor because it was an integral part of the operation of the debtor's business. The Court said:

We conclude, as a matter of practical observation and common sense, considering the economic realities, that under the facts of this case, where the warehouses (not only in North Little Rock but elsewhere) played a substantial role in the business and were used as a critical element in the growth of McCrary's, Central Terminal Warehouse was an additional place of business for McCrary's.

The Eighth Circuit reversed the bankruptcy court which found the warehouse which McCrary's did not use as an address, where it kept no employees, did not meet customers or creditors, did not keep records or maintain an office not to be a place of business of McCrary's.

Similarly, the Bankruptcy Court in *In re Pocono Airlines, Inc.,* 87 B.R. 325 (Bankr. M.D.Pa.1988), electing to follow *McCrary's,* found it unnecessary to choose between the various tests suggested by the cases, basing its conclusion "on practical observation and common sense considering the economic realities presented by the facts" of the case before it. *In re Pocono Airlines, Inc., supra,* 87 B.R. at 327. In that case the Bankruptcy Court found that despite the fact an airline's physical plant, letterhead and all tax payments were all in a single county, it was, nevertheless, doing business in more than one county because it flew to several airports and contracted with major creditors at such airports for such services as fueling, ticket reservations, passenger and baggage handling.

*See also, In re Alithochrome Corp.,* 31 B.R. 352 (Bankr.S.D.N.Y.1983), *vacated to permit appeal,* 34 B.R. 354 (Bankr.S.D.N. Y.1983), in which it was the debtor, a Hauppauge corporation, which claimed a second location in Springfield, Massachusetts. The bankruptcy court agreed because the Hauppauge company's vice president regularly spent several days of each week in Springfield, and while there attended to the business of both Springfield and Hauppauge facilities, received phone calls from employers, customers and suppliers at the Hauppauge plant, dealt with production, sales orders, price and work flow relating to Hauppauge. Finally, the Hauppauge company had represented to customers and suppliers that it conducted a facility in Springfield and its suppliers and customers had visited the Springfield plant and regarded it as a Hauppauge facility.

On the other hand, in *Alstead Automotive Warehouse, Inc., supra,* 16 B.R. 926, in which the debtor's owners formed other wholesale and retail companies under very similar names, to carry on the same type of business, Bankruptcy Judge Hall, nevertheless found that the debtor was doing business only in one county. He found that the wholesale and retail establishments "maintain their own inventories, their own clientele and their own books and records; they were billed individually by their suppliers (who were obviously aware of this separateness) and they billed their own customers separately."

The facts here, as well as the underlying economic reality, are very different. In this case the appearance and reality was that the furniture business that was being conducted in Suffolk on Route 112, Medford, under the name "Woodfield Furniture" was being conducted in Queens on Main Street, Flushing, under the same name. The stores in Suffolk and Flushing were supervised by the same personnel, maintained their records in the same location, were financed by the same source and held themselves out to the public as the same enterprise.

Goods shipped to the Flushing store came from the same warehouse as supplied the Woodfield–Suffolk stores. The Flushing store acted as a showroom for the furniture enterprise started under the name Woodfield–Suffolk. The Flushing store was an integral part of the overall enterprise just like the warehouse in *In re McCrary's.* It was a place of business for Woodfield–Suffolk.

The contention that Woodfield–Suffolk was doing business only in one county rests entirely on how Boneparth claimed to have used his various corporate vehicles. According to Boneparth, the Flushing store was part of the same corporate enterprise that operated the Monticello store and not of the one which operated the Suffolk stores. However, the debtor produced no corporate records nor books of account or any other evidence of any significance to

bear out this claim. On the contrary, whatever the debtor did produce showed the close relationship among all the companies. The corporations operating outside Suffolk were either identified as subsidiaries of the debtor or as other places of business.

Both to the public and to Chrysler, the supplier of almost 80 percent of his merchandise, Boneparth represented the various Woodfield stores as part of the same common enterprise. To the public he dubbed them all "Woodfield Furniture" stores.

There are a few straws of evidence tending to show that the Monticello store allegedly operated by Woodfield–Outlet had some separate identity from Woodfield–Suffolk, but as to Flushing there is even less. In what name Boneparth made a lease or how he advised utilities to bill the Flushing store is of no materiality. It does not change how the Flushing store was perceived by suppliers and customers nor its practical integration with Woodfield–Suffolk.

Furthermore, Chrysler's representatives were all in agreement that Boneparth had advised them in response to specific questions that Flushing was part of Woodfield–Suffolk. The Court does not credit his denial of these conversations. He was not a credible witness. The testimony of Chrysler's personnel, on the other hand, was borne out by the contemporaneous documents and by their actions. Consistent with their testimony as to what Boneparth told them of the division of his business among his corporations they registered the security interest in Factory–Outlet's collateral in Sullivan County as well as in Albany, while filing only in Albany with respect to the security interest of Woodfield–Suffolk's collateral. Obviously Chrysler could as easily have made a single filing as to Factory–Outlet's collateral and a dual filing as to Woodfield–Suffolk if Boneparth had advised them, as he now claims, that Flushing was not part of Factory Outlet.

Economic realties permit but one conclusion, Flushing was part of a single economic enterprise with Woodfield–Suffolk and Woodfield–Suffolk, by virtue of its use of Flushing as a place of business, was doing business in more than one County.

But even if Flushing had not been a place of business of Woodfield–Suffolk, the same result would appear to be compelled by the recent decision of the Court of Appeals in *Sanyo Electric, Inc. v. Howard's Appliance Corp.*, 874 F.2d 88 (2d Cir.1989). In that case the Court held that where there had been a failure to file a financing statement in the appropriate locale because the debtor had misled the creditor, a constructive trust arose as a result of which the property covered by the security interest never became part of the debtor's estate. The Court said:

> Here, however, Sanyo's failure to file is directly attributable to Howard's misconduct. Had Howard informed Sanyo that it was storing merchandise in New Jersey, Sanyo would have had the opportunity to perfect its interest there. Under these circumstances, we are authorized by the law of New Jersey to impress a constructive trust; as the beneficiary of the trust, Sanyo now enjoys a position superior to that of any lien creditor and to any of Howard's other creditors as well.

At 95.

The facts here are even stronger because here there was active misconduct. The debtor signed financing statements positively asserting that Woodfield–Flushing was a place of business of Woodfield–Suffolk. He signed at least one such financing statement and made the same representations orally.

The efforts of the debtor's attorney to describe Mr. Boneparth as an unsophisticated businessman unfamiliar with the nuances of the Uniform Commercial Code are misplaced. Mr. Boneparth is a businessman of forty years experience who has operated a number of companies, under a variety of names in several states. Woodfield Furniture was not a "Mom and Pop" operation but a million dollar business.

Furthermore, whether or not he appreciated the legal significance of the statements that Woodfield–Suffolk had as an additional location the Flushing store, it was a blatant misrepresentation if the facts

were otherwise. If the documents Mr. Boneparth were asked to sign were not accurate, he should not have signed them. Having done so he cannot avoid the consequences of Chrysler's reliance on them. However, it is not necessary to reach the issue as to whether a constructive trust arose here because it was true, exactly as Boneparth represented, that Flushing was a location where Woodfield–Suffolk did business.

Chrysler perfected its security interest on all the debtor's inventory when it filed a financing statement in Albany. It was not required to file a financing statement in Suffolk to perfect its lien because Woodfield–Suffolk at the time was doing business in more than one county.

### Conclusions of Law

Chrysler duly perfected its lien on its security interest in the debtor's collateral.

That lien is not subject to avoidance.

The debtor is unable to give Chrysler adequate protection of its security interest.

Chrysler is entitled to relief from stay.

An Order consistent with this Opinion has earlier been entered.